✓ FILED ___ ENTERED
___ LOGGED ___ RECEIVED

8:45 am, May 27 2025
AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ____M.G.____ Deputy

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR A SEARCH WARRANT FOR:<br><br>THE CHEEK CELLS/SALIVA (BUCCAL SWABS) OF KELVIN ENRIQUE ARGUETA | Case No. 8:25-mj-01110-TJS |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, James Walsh, a Task Force Officer with the Federal Bureau of Investigation, being duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. This affidavit is being submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to obtain deoxyribonucleic acid ("DNA") for comparison purposes, in the form of two (2) buccal swabs, from **KELVIN ENRIQUE ARGUETA ("ARGUETA")**, born on April 4, 1995. I seek to seize this evidence in furtherance of an investigation of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances); 18 U.S.C. § 922(g)(1) (felon in possession of a firearm and ammunition); and 18 U.S.C. § 924(c)(1)(A) (using, carrying, and possessing a firearm in furtherance of a drug trafficking crime) collectively, the "**TARGET OFFENSES.**"

2.      Your Affiant is a Task Force Officer with the Federal Bureau of Investigation ("FBI") and am an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States empowered by law to conduct investigations of, and to make arrests for, violations of federal law. Your Affiant is also a detective with the Montgomery County Police Department ("MCPD") for over 13 years. I am presently assigned to the FBI Baltimore Field Office and have been working with the FBI for over eleven years.

3.      Through training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. Throughout the course of conducting narcotics investigations, I have been involved in the use of various following investigative techniques, including interviewing informants and cooperating witnesses; conducting controlled purchases of narcotics; physical surveillance; reviewing electronic surveillance, such as security or other footage; conducting short term undercover operations, including reverse undercover drug operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized electronic surveillance, including wire and/or electronic interceptions; and preparing and executing search warrants that have led to substantial seizures of narcotics, firearms, and other contraband.

4.      I have participated in a number of Organized Crime Drug Enforcement Task Force ("OCDETF") investigations concerning drug trafficking organizations involved in the distribution of various controlled substances, including heroin, fentanyl, cocaine hydrochloride, cocaine base or "crack" cocaine, phencyclidine ("PCP"), eutylone/di-methlypentalone ("boot"), and marijuana. I have participated in hundreds of hours of surveillance of drug dealers and drug traffickers and have observed hundreds of "hand-to-hand" drug transactions. I have developed continuing education

law enforcement classes centered on drug investigation and taught said classes to agencies in the Washington D.C. Metropolitan area. Through these investigations, training, and my experience, I am familiar with the concealment methods utilized by drug and weapons traffickers, to include the use of "stash" houses and locations (locations where drug traffickers store narcotics that may be independent from their residences) utilized by drug traffickers to conceal weapons, narcotics, bulk currency, and drug distribution paraphernalia. In addition, your Affiant knows that drug traffickers often possess a firearm in furtherance of their drug trafficking, for the purpose of protecting themselves, their drug proceeds, and their illicit drugs.

5. As a result of this experience, I am familiar with narcotics traffickers' methods of operation including the distribution, storage, and transportation of narcotics; the collection of money that represents the proceeds of narcotics trafficking; and money laundering. I am aware that drug traffickers often utilize several locations to store narcotics and narcotics proceeds, including, but not limited to their residences, vehicles, and "stash" houses. I am also aware that drug traffickers utilize "counter-surveillance" or erratic driving techniques in order to evade law enforcement detection. Based on my training and experience, drug traffickers also use cellular telephones, residential telephones, addresses, and vehicles that may not be subscribed in their own names to avoid detection by law enforcement.

6. During my previous investigations, I have employed a variety of investigative techniques, including the utilization of DNA samples collected for the purpose of facilitating DNA comparison analysis. Based on my background, training, and experience, I am familiar with the fact that each person has a unique DNA composition, with the exception of identical twins. DNA can be found in bodily tissues, including blood, hair, skin cells, and other genetic material. I am also aware, based on my training and experience, that individuals regularly and unknowingly leave behind trace samples of their DNA at crime scenes, on various objects like water bottles,

3

firearms, and firearms accessories that are used in the commission of criminal activity. These samples can be collected and compared to known DNA samples to determine the presence or absence of a subject's DNA contributions. This comparison can help identify or eliminate suspects of violations of criminal statutes.

7. A DNA sample suitable for comparison may be obtained by swabbing the inside of a person's mouth, commonly known as a "buccal swab." Buccal samples are obtained by asking the subject to open their mouth, whereupon a law enforcement officer (or the subject upon request of the law enforcement officer) inserts a sterile, elongated "Q-tip" into the subject's mouth, which is then rubbed vigorously along the inside of the subject's cheeks and elsewhere inside the mouth.

8. Because this affidavit is being submitted for the limited purpose of obtaining a search warrant for a buccal swab of **ARGUETA**, I have not set forth every fact learned during this investigation. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all my knowledge, or the knowledge of others, about this matter.

9. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that **ARGUETA,** and others have committed the **TARGET OFFENSES**. I further submit that there is probable cause to believe that evidence of the **TARGET OFFENSES** will be found located in cheek cells/saliva (buccal swabs[1]) of **ARGUETA**. Specifically, the buccal swabs will be used to test against DNA profiles developed

---

[1] As the Supreme Court has recognized, a "buccal swab" is a "common procedure" that involves "wiping a small piece of filter paper or a cotton swab similar to a Q-tip against the inside cheek of an individual's mouth to collect some skin cells." *Maryland v. King*, 133 S. Ct. 1958, 1967-68. This procedure is "quick and painless" and poses "no threat to the health or safety" of a defendant. *Id.* at 1968.

from the evidence recovered in this case, as described in further detail below. Such evidence can be analyzed to determine whether the profile of **ARGUETA** is included within the profiles developed from the evidence (or, alternatively, whether the profiles may be excluded from those obtained from the evidence).

## PROBABLE CAUSE

10. In June 2024, MCPD officers began investigating an individual who was distributing cocaine, a Schedule II controlled substance, in Montgomery County, Maryland. Between late July and early November 2024, MCPD officers coordinated three covert controlled purchases of cocaine from the individual. To arrange the transactions, officers used a phone number associated the individual, 202-246-9118.

11. Officers searched law enforcement databases using telephone number 202-246-9118 and discovered on June 1, 2021, a Hispanic male, who was identified by law enforcement as ARGUETA by his Washington D.C. driver's license, provided that phone number during a property damage collision in Gaithersburg, Maryland. Officers then searched the District of Columbia's Department of Motor Vehicle records for ARGUETA and obtained his photograph. From the photograph, officers positively identified ARGUETA as the individual distributing cocaine in Montgomery County, Maryland.

12. Following two separate controlled purchases of cocaine from ARGUETA, law enforcement officers observed ARGUETA entering 9302 Willow Creek Drive, an apartment complex in Montgomery Village, Maryland. Officers subpoenaed the apartment complex's leasing office and the office's records confirmed that ARGUETA was a leaseholder at the apartment complex, residing as 9302 Willow Creek Drive, Unit G ("the Residence").

13. On November 13, 2024, Honorable Jennifer Fairfax of Montgomery County Circuit

Court issued a search and seizure warrant for the Residence.

14. On November 14, 2024, MCPD officers executed the court-ordered search warrant at the Residence. When officers entered the Residence, they encountered ARGUETA, his girlfriend, and two small children. Officers observed ARGUETA quickly move from a bedroom to a bathroom. After approximately twenty seconds, ARGUETA exited the bathroom and officers placed him into handcuffs. In the bathroom, officers observed a white powdery substance on the floor and inside and on the toilet bowl. Inside the toilet were two hockey-puck size discs consisting of the same white powdery substance. Officers recovered the discs which contained approximately 79.96 grams of cocaine, a Schedule II controlled substance.

15. In a bedroom that ARGUETA shared with his girlfriend and two children, officers recovered a loaded black and silver .40 caliber Ruger handgun in a dresser drawer. On the floor of the bedroom closet, in a safe, officers found a bubble-wrapped brick-shaped object, which contained approximately a kilogram of cocaine. Inside the safe were also three bundles of United States currency, secured by rubber bands. It should be noted that drug traffickers will often store United States currency in rubber banded bundles or "bands." These "bands" are usually presorted and counted into known denominations so that the trafficker is able to quickly tabulate the proceeds of their illicit enterprise. Finally, on the bed, officers recovered ARGUETA's iPhone.

16. In a second bedroom, which, based on the room's contents, was used for storage and an office, officers recovered a loaded privately manufactured firearm, ammunition, and a loaded handgun magazine. In the room, officers also seized, four functioning digital scales, three of which contained a white powdery residue, and a plastic bag containing several rubber banded bundles of United States currency. The approximate total amount of currency seized from the residence was $47,856.00. Officers also recovered controlled substances including: a plastic bag with crystalline solid material containing 0.68 grams of methamphetamine; a plastic bag with

nineteen pink tablets containing a total of 1.9 grams of oxycodone; a plastic bag containing 4.81 grams of psilocin; and two plastic bags of white powder, with one bag containing 2.61 grams of cocaine. Methamphetamine, oxycodone, and cocaine are schedule II drugs. Psilocin is a schedule I drug.

17. ARGUETA's clothes, driver's license, and wallet were also found in the Residence.

18. Based on your affiant's training, knowledge, and experience, the amount of suspected controlled substances, especially the amount of cocaine, recovered is indicative to possession with intent to distribute and not for personal use.

19. Following execution of the residential search warrant, the Maryland Gun Center was notified and advised that ARGUETA was prohibited from possessing a handgun or ammunition based on a prior conviction for second-degree assault in Maryland. *See Maryland vs. Argueta*, Montgomery County District Court Case No. 5D00416785.

20. The MCPD Electronic Crimes Unit (ECU) forensically extracted the data within ARGUETA's iPhone. Contained within the data were numerous contacts, SMS messages, and images. At the time of this writing, investigators are in the process of reviewing the data.

21. From an initial review of the data within ARGUETA's iPhone, your affiant has viewed images of firearms and suspected controlled dangerous substances. A few of those photos are shown below. In several photos, ARGUETA is holding a firearm. Other photos display items seized during the search of the Residence, including the firearm and a suspected kilogram of controlled substances found in ARGUETA's bedroom.



*Photo from ARGUETA's iPhone of him holding what appears to be semi-automatic handgun*




*Photos from ARGUETA's iPhone compared to items seized from ARGUETA's bedroom*




## THE BUCCAL SWABS AND FORENSIC EVIDENCE RECOVERED IN THIS CASE

22. Buccal swabs from **ARGUETA** are needed in order to compare his profile to any interpretable/usable DNA profiles developed from the recovered firearms or from any other evidence seized during the investigation into the **TARGET OFFENSES**. A match between, inclusion of, or exclusion of **ARGUETA's** DNA and DNA on the evidence would make a fact of consequence (e.g., the identity of the perpetrator) more or less probable.

23. Your Affiant will coordinate obtaining the buccal swabs from **ARGUETA**.

**CONCLUSION**

24. Based upon the above-referenced facts, Your Affiant submits that there is probable cause to believe that there is evidence of the **TARGET OFFENSES** that will be found in the cheek cells/saliva (buccal swabs) of **ARGUETA**. I request that the Court issue a warrant authorizing law enforcement agents assisting in the above-described investigation, to obtain a buccal swab sample from **ARGUETA**, so that the sample may be compared to evidence collected during the course of this investigation.

Respectfully submitted,

James Walsh
Task Force Officer
Federal Bureau of Investigation

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this 24th day of April 2025.

The Honorable Timothy J. Sullivan
United States Chief Magistrate Judge
District of Maryland

## ATTACHMENT A

### Person to Be Searched

The person to be searched is **KELVIN ENRIQUE ARGUETA,** who is currently remanded at the Montgomery County Correctional Facility (MCCF) located at 22880 Whelan Lane, Boyds, Maryland. ARGUETA's date of birth is April 4, 1995.

## ATTACHMENT B

### Items to be seized from ARGUETA

    All items constituting evidence, fruits, and/or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances); 18 U.S.C. § 922(g)(1) (felon in possession of a firearm and ammunition); and 18 U.S.C. § 924(c)(1)(A) (using, carrying, and possessing a firearm in furtherance of a drug trafficking crime) by **KELVIN ENRIQUE ARGUETA**, as described in the search warrant affidavit, including, but not limited to, the following: a sample of the deoxyribonucleic acid ("DNA") of the person identified in Attachment A to be collected via buccal or oral swab in accordance with stablished procedures, and to be analyzed forensically in accordance with the applicable, valid established procedures.